**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MICHAEL P.,** | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| | : | |
| **vs.** | : | **NO. 24-cv-5545** |
| | : | |
| **FRANK BISIGNANO,** | : | |
| **Commissioner of Social Security,** | : | |
| **Defendant.** | : | |

**MEMORANDUM OPINION**

**LYNNE A. SITARSKI**
**UNITED STATES MAGISTRATE JUDGE** **August 17, 2026**

Michael P. (Plaintiff) brought this action seeking review of the Commissioner of Social Security Administration's (SSA) decision denying his claim for Social Security Disability benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-433 (the Act). This matter is before me for disposition upon consent of the parties. For the reasons set forth below, Plaintiff's Request for Review (ECF No. 7) is **GRANTED**.

## I. PROCEDURAL HISTORY

Plaintiff protectively filed the instant application for disability benefits on January 20, 2023, alleging disability beginning June 9, 2009, due to major depressive disorder, obsessive compulsive disorder (OCD), obsessive compulsive personality disorder (OCPD), attention deficit hyperactive disorder (ADHD), anxiety, high blood pressure, and back problems. (R. 367, 372). His application was denied at the initial level on May 9, 2023, and upon reconsideration on August 9, 2023. (R. 366-71, 372-76). He thereafter requested a hearing before an Administrative Law Judge (ALJ). (R. 416-17). On March 11, 2024, Plaintiff, represented by

counsel, and a vocational expert (VE), testified at the administrative hearing. (R. 35-65). On March 19, 2024, the ALJ issued a decision unfavorable to Plaintiff. (R. 15-34). He appealed the ALJ's decision, and the Appeals Council denied Plaintiff's request for review on August 23, 2024, thus making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. (R. 1-7).

On October 18, 2024, Plaintiff filed a complaint in this Court. (Compl., ECF No. 1). He consented to the jurisdiction of the Honorable Elizabeth T. Hey, United States Magistrate Judge, pursuant to 28 U.S.C. § 636(c) on October 22, 2024. (Consent, ECF No. 4). On January 10, 2025, Plaintiff filed a Brief and Statement of Issues in Support of Request for Review. (Pl.'s Br., ECF No. 7). The Commissioner filed a Response on February 1, 2025, (Resp., ECF No. 8), and Plaintiff filed a Reply on February 13, 2025. (Reply, ECF No. 9).

This case was reassigned to me on April 29, 2026, (Order, ECF No. 10), and Plaintiff consented to my jurisdiction pursuant to 28 U.S.C. § 636(c) on May 8, 2026. (Consent, ECF No. 12). This case is fully briefed and ripe for disposition.

## II. FACTUAL BACKGROUND[1]

The Court has considered the administrative record in its entirety and summarizes here the evidence relevant to the instant request for review.

Plaintiff was born on June 8, 1980, and was 29 years old on the alleged disability onset date. (R. 37; Resp., ECF No. 8, at 1). He received a law degree in 2005. (R. 44). His past

[1] Because the parties dispute the relevance of some medical evidence generated outside of the disability period, I note that Plaintiff alleges disability beginning June 9, 2009, (Pl.'s Br., ECF No. 7, at 1), and his date of last insured is December 31, 2013. (R. 18). Therefore, the applicable disability period is June 9, 2009, through December 31, 2013.

relevant work includes work as a lawyer from 2005 through 2010. (R. 44-46).

**A. Medical Evidence**

Plaintiff has struggled with OCD, depression, anxiety, ADHD, and other mental health issues since childhood. (*See, e.g.*, R. 579. 582). His asserted impairments primarily revolve around how his OCD and other mental conditions affect his ability to function. (Pl.'s Br., ECF No. 7, at 3-5). He also maintains that a concussion suffered on July 26, 2013, exacerbated his condition and brought on new symptoms. (Pl.'s Br., ECF No. 7, at 5-10).

Plaintiff began treating with psychologist Amy Wenzel as early as June 10, 2009, and continued to treat with her through at least January 2024. (R. 563-64, 579-81, 585-92, 594-95, 607-09, 612-16). Plaintiff has had over 1000 sessions with Wenzel, and she has issued multiple opinions regarding his limitations and functionality throughout the course of their treating relationship. (R. 563-64, 579-81, 585-87, 588-92, 607-09, 612-16).

In an April 28, 2010, report, Wenzel summarized treatment sessions that occurred between June 10, 2009, through April 21, 2010. (R. 563-564). She noted that during that time, Plaintiff had participated in 41 cognitive behavioral therapy (CBT) treatment sessions with her to address his symptoms of depression, anger, chronic suicidal ideation, and OCD. (R. 563). Specific strategies and interventions attempted included motivational enhancement, cognitive restructuring, behavioral activation, problem solving, and progressive muscle relaxation. (*Id.*). Wenzel observed that it was "clear" that throughout the course of treatment, Plaintiff's "motivation for change" remained "low." (*Id.* (noting Plaintiff believed "CBT is for suckers" and that he stated he was only attending sessions to keep his parents "off [his] back") (alteration in original)). (*Id.*). In her opinion, Plaintiff created a self-fulfilling prophecy that ensured the CBT sessions would not be effective. (*Id.*). Nevertheless, Wenzel added Plaintiff had never

missed a session, initiated additional optional sessions, and maintained close contact with Wenzel and reached out to her when he was actively in distress. (*Id.*). Though she felt his OCD made it difficult for him to engage in therapy sessions given that they "exacerbate[d] his distress," Wenzel opined that Plaintiff "attained some non-specific benefits of psychotherapy in the context of a strong therapeutic relationship." (*Id.*). Nevertheless, Wenzel added that "his symptomatology, level of distress, and level of functioning remain essentially unchanged (or have deteriorated)," and Plaintiff had ultimately "not responded to evidence-based intervention." (*Id.*). Wenzel reported that she had recommended to Plaintiff that he seek more intensive treatment for his OCD symptoms. (*Id.*). At first, he was hesitant; however, after having the opportunity to work a "2-week legal job" and experiencing the "extreme distress" that his OCD symptoms presented in the work environment, Plaintiff realized the extent to which his symptoms limited him. (R. 563-64). He thereafter began receiving more intensive treatment with the University of Pennsylvania's "OCD clinic." (R. 564).

Plaintiff participated in more intensive treatment programs at Rogers Memorial Hospital in Oconomowoc, Wisconsin, from March 31 through July 28, 2011, and from February 26 through May 31, 2013. (R. 565-70, 600-06). During the first course of treatment in 2011, Plaintiff was primarily treated by Mark Rossing, M.D. (*See* R. 565-70). In April 2011, Dr. Rossing performed a psychiatric evaluation of Plaintiff in which he reported feeling: nervous and worried about everything; "a certain amount of adrenaline going" at all times; and on edge constantly. (R. 565). Plaintiff also related that he ruminated about losing time and not being able to accomplish everything he feels he must, and that this in turn led to panic and paralysis to the point that he ultimately could not accomplish any daily tasks. (*Id.*). During these episodes, he experienced panic attacks, which included an elevated heart rate, racing thoughts, shortness of

breath, hyperventilation, and dizziness. (*Id.*). Upon examination, Dr. Rossing noted Plaintiff: had previously struggled with treatment for OCD, depression, and anxiety; had normal appearance with a cooperative and pleasant demeanor; was mildly irritable, discouraged, frustrated, overwhelmed, and had a depressed and anxious affect, but otherwise demonstrated "no gross observational abnormalities"; and demonstrated normal speech pattern with linear and goal-directed thought process and grossly intact cognitive function. (R. 566-67). In addition, Dr. Rossing reported that Plaintiff had "3/3" memory and beneficial "assets," including good verbal skills, intelligence, "supportive family," and "good physical condition." (R. 567).

Plaintiff was discharged from Rogers Memorial Hospital on July 18, 2011. (R. 568). At that time, Dr. Rossing observed that the treatment program had been "relatively successful" and that Plaintiff "seemed to do much better in terms of his exposures and the more defined work he was doing later in his stay." (*Id.*). He recorded that Plaintiff was able to complete 70 percent of his exposures since admission, he had significantly decreased his harmful "information-seeking behaviors," his Yale-Brown Obsessive-Compulsive Scale (Y-BOCS) had improved from 34 down to 22, and his Beck Depression Inventory improved from 33 down to 17. (*Id.*). Dr. Rossing also reviewed the various medication trials attempted and noted that ultimately Plaintiff tolerated Celexa "fairly well," which seemed to improve his mood without any side effects or complications. (R. 569). Ultimately, Dr. Rossing found that Plaintiff was doing relatively well upon discharge with a "marked improvement" in his anxiety and mood. (*Id.*).

Plaintiff returned to Rogers Memorial Hospital on February 26, 2013, where again Dr. Rossing served as his primary treating physician. (*See* R. 600-06). Upon admission, Plaintiff reported a return of his symptoms of anxiety and OCD along with ongoing symptoms of depression, irritability, and feeling overwhelmed. (R. 600). His symptoms resulted in an

"incessant" need to constantly seek out information in order to "know everything." (*Id.*). This behavior in turn had resulted in Plaintiff "avoiding normal functional themes in his life," spending very little time with family and peers, and trouble getting out of bed. (*Id.*). On April 10, 2013, Dr. Rossing performed a psychiatric evaluation, finding that Plaintiff: was alert and oriented, albeit somewhat stressed and tearful during the examination; demonstrated a normal speech pattern, linear thought content, and grossly intact cognition; had "3/3" memory; and had beneficial assets in the form of his intelligence and adequate physical health. (R. 601). However, he acknowledged the "severity" of Plaintiff's mental impairments, including their recurrence and persistence and Plaintiff's prior lack of response to treatment. (*Id.*).

Plaintiff was discharged on May 31, 2013. (R. 604). Dr. Rossing completed a review of Plaintiff's course of treatment on July 8, 2013, at which time he found: "relatively significant improvement" in Plaintiff's anxiety, mood, and OCD symptoms; that Plaintiff was able to "accomplish 69% of his hierarchy, nearly the 70% that was anticipated upon his return to outpatient care"; and Plaintiff's Y-BOCS and Quick Inventory of Depressive Symptomatology (QIDS) scores dropped from 33 to 19 and from 16 to 6, respectively. (*Id.* (alterations added)). Notwithstanding this improvement, however, Dr. Rossing added that Plaintiff: "continued to struggle with fairly persistent anxiety, particularly related to obsessive theme that he struggled with, yet with improvement with ability to challenge it and with a marked reduction in distress over it relative to his admission symptoms"; struggled with "staying on track and focused"; and had "difficulties pausing, stopping, relaxing, and not being preoccupied with details of his day and accomplishing things throughout his day." (R. 605). Dr. Rossing observed that various medication trials were attempted, though he did not indicate whether any were effective. (*Id.*).

On July 26, 2013, Plaintiff suffered a concussion when he fell at home and hit his jaw on

a table and then his head on the floor. (R. 583). He was taken to Bryn Mawr Rehabilitation Hospital, treated for his concussion symptoms, and thereafter participated in a traumatic brain injury (TBI) treatment program lasting approximately nine months. (R. 48, 578, 583-84). Additionally, Plaintiff participated in speech, physical, vestibular and visual therapies and "improved greatly." (R. 48, 583). However, he suffered a setback when he "hit his head" a second time in 2015. (R. 58, 583). Beth Kolar, P.T., provided an update on his outpatient treatment on February 19, 2014, noting that Plaintiff: was exhibiting "low ocular motor endurance and consistent headaches" that inhibited his ability to participate in work, recreational, or social activities; and could tolerate lengthy cognitive challenges environments with multiple stimuli. (R. 578). Lynn Greenspan, O.D., provided another update on September 9, 2015, in which she observed that Plaintiff had lingering symptoms, including: night terrors and sweats; "PTSD-like symptoms" causing sleep disturbances; diplopia and associated nausea; and pain in his eyes, ears, and teeth. (R. 583-84).

On July 28, 2013, Plaintiff presented to Daniel Scott, PA-C with Doctor's Best Immediate Medical Care in Berwyn, Pennsylvania. (R. 571-73). Upon examination, Scott recorded that Plaintiff: was well-developed, well-nourished, and generally in no acute distress; had normal ear, nose, and throat indicators; did not demonstrate cervical lymphadenopathy; had normal gait and posture, supple neck, good range of motion, and normal shoulder shrug strength; had intact cranial nerves at 9 and 12; and was alert and oriented to person, place, and time. (R. 572).

On November 5, 2013, Plaintiff underwent an MRI at Neurology Consultants in Paoli, Pennsylvania, indicating largely normal results with "minimal left sphenoid sinus thickening." (R. 574). At a follow-up appointment one week later, Plaintiff reported he was doing 75 percent

better since his concussion. (*Id.*). At that time, Plaintiff had yet to start the aforementioned TBI treatment program. (*Id.*).

Plaintiff treated with psychiatrist Elizabeth S. Goldman, M.D., at Penn Medicine's neurology department beginning February 13, 2012. (R. 582). On August 11, 2014, Dr. Goldman offered a retrospective summary of Plaintiff's treatment. (*Id.*). She stated that Plaintiff first presented to her with "chronic symptoms of obsessive thoughts, compulsive behaviors, anxiety, depression, hopelessness, helplessness, anger, rigidity and suicidality." (*Id.*). She added that she saw Plaintiff every three to four weeks and collaborated closely with Wenzel in curating his course of treatment. (*Id.*). According to her, he met the criteria for OCD, generalized anxiety disorder, major depressive disorder, night eating syndrome, and personality disordered traits. (*Id.*). Dr. Goldman noted that over the next two years, Plaintiff participated in intensive CBT, multiple medication trials, several inpatient hospitalizations and treatment programs, two sleep studies, and family interventions. (*Id.*). Notwithstanding these treatment efforts, Dr. Goldman opined that Plaintiff "progressively and severely declined in his ability to function" during that period. (*Id.*). Dr. Goldman also observed that since suffering a concussion in July 2013, Plaintiff: suffers from extreme fatigue and a grossly altered sleep-wake cycle; experiences chronic headaches and eye muscle weakness; has worsened obsessive, anxiety and depressive symptoms; spends most of the day in bed; and participated in an intensive hospital-based TBI rehabilitation program for several months with only minimal relief. (*Id.*). She then assessed Plaintiff's prognosis as "poor to fair" and offered that he was "unable to work and at present [she did] not foresee him having an ability to achieve and/or maintain gainful employment." (*Id.*).

On August 11, 2014, Wenzel again summarized Plaintiff's care and opined regarding how his impairments affected his functionality. (R. 579-81). By this date, Plaintiff had

participated in more than 300 therapy sessions with her. (R. 579). She first reviewed Plaintiff's diagnoses, which dated back throughout the duration of their treating relationship. (R. 579-80). As relevant here, Plaintiff had moderate to severe major depressive disorder and OCD, with a global assessment functioning (GAF) score of 50. (R. 579). In addition, Wenzel noted that Plaintiff presented with persistent suicidal ideation (without intent), pervasive hopelessness, rigidity, an inability to tolerate emotional distress, skepticism about treatment, and significant anger, irritability, and hostility. (*Id.*). She concluded that his limitations resulted in "substantial life interference and emotional distress," including the inability to keep a job, withdrawal from activities outside the home, and the inability to deal with unplanned events "that took time away from the targets of his obsessive compulsive symptoms." (*Id.*). She continued that beginning in 2012, Plaintiff experienced significant sleeping and eating issues which further impaired his ability to function, and which were associated with a decreased GAF score of 30 to 35. (R. 580). Wenzel also noted that in 2011 and 2013, Plaintiff was admitted for intensive inpatient treatment for his OCD symptoms, after which his OCD symptoms, suicidal ideation, and "ability to cope when things do not go as planned" noticeably progressed. (*Id.*).

Notwithstanding this improvement, Wenzel determined that his OCD symptoms remained at a moderate to severe level and continued to affect his ability to maintain employment or engage meaningfully outside the home. (*Id.*). Moreover, she highlighted that in July 2013 Plaintiff experienced a concussion resulting in chronic headaches, nausea, dizziness, and extreme fatigue. (*Id.*). These symptoms, in turn, prevented Plaintiff from progressing in his course of CBT for his OCD symptoms. (*Id.*). Additionally, Wenzel opined that Plaintiff's prognosis at that point was poor because he could not implement the skills learned in his CBT needed to surmount his mental health challenges. (*Id.*). She added that although Plaintiff had

undergone several years of CBT "with some progress in certain areas," he had not made enough "to seek and maintain employment." (*Id.*).

Wenzel provided another treatment summary and opinion on December 20, 2022, largely restating the same diagnoses, symptoms, and course of treatment. (R. 585-87). She noted that beginning in 2012, Plaintiff started to show significant disturbances in his sleep-wake cycle and eating patterns, further impairing his functioning and leading to a lowered GAF score of 30 to 35. (R. 586). His July 2013 concussion exacerbated these sleep issues. (*Id.*). Wenzel then reiterated that Plaintiff's prognosis remained "moderately poor to fair." (R. 586-87).

On February 13, 2023, Wenzel again offered her findings as to Plaintiff's functional capacity, highlighting myriad significant symptoms and limitations based on his impairments. (R. 588-92). She determined that Plaintiff: had a GAF score of 30 to 35; exhibited post-concussion symptoms resulting in a poor prognosis; demonstrated only "limited response" to his CBT treatment over the course of their treating history; and had difficulty maintaining attention, sleep-wake issues, suicidal ideation, generalized anxiety, decreased energy, mood disturbance, concentration issues, occasional suspiciousness, recurrent obsessions and compulsions creating marked distress, emotional lability, and several other mental symptoms. (R. 588-89). She then opined that Plaintiff was at least seriously limited in his ability to: carry out even very short and simple instructions; maintain attention for two hours; maintain regular attendance and be punctual within customary, usually strict tolerances; sustain an ordinary routine without special supervision; complete a normal workday and workweek without interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors; get along with co-workers or peers without unduly distracting them or exhibiting

behavioral extremes; respond appropriately to changes in a routine work setting; deal with even normal work stress; set realistic goals or make plans independently of others; and interact appropriately with the general public and maintain socially appropriate behavior. (R. 590-91). He was "unlimited or very good" in several other respects, however. (*Id.*). Further, she concluded that these limitations would result in Plaintiff missing more than four days of work per month. (R. 592). Of note, Wenzel clarified that these limitations were "based on history to this point." (*Id.*).

On January 15, 2024, Wenzel provided yet another summary of Plaintiff's care and accompanying opinion regarding his functionality. (R. 607-09). After recapping the former, she added that in July 2009 his impairments impacted his ability to work, although with successful treatment he could still "maintain limited employment (e.g., either part-time or with modifications to allow him to apply therapeutic strategies to manage his mental health symptoms)." (R. 607-08). She again noted that after participating in more intensive inpatient treatment programs in 2011 and 2013, Plaintiff showed "noticeable progress" with his OCD symptoms. However, she continued that the July 2013 concussion caused significant side effects that exacerbated his mental impairments. (R. 609). Finally, based on these post-concussion symptoms, Wenzel found that his prognosis was poor because he was unable to implement the skills necessary to sustain goal-driven behaviors to maintain employment or to overcome his mental health challenges and clarified that his post-concussive symptoms have persisted since July 2013 with little change in their manifestation or extreme effects on his functionality, "suggesting that there is no evidence that they will abate so that he can take on even very basic or part-time employment." (*Id.*). On January 24, 2024, Wenzel offered another medical source statement regarding Plaintiff's limitations at that time that was largely consistent with her prior

medical source statements. (R. 612-16).

On January 16, 2024, Lawrence Bellow, D.O. provided a medical source statement indicating that: Plaintiff began treating with him on September 3, 2014, for his post-concussion syndrome; his lingering symptoms included headaches, nausea, abdominal pain, vertigo, visual difficulties, cognitive dysfunction with concentration and memory difficulties as well as bilateral ear pain and night terrors and sweats; and his headaches were manageable with activities of daily living restricted to bathing and eating, as "[a]ny additional activity including reading exacerbate[d] his symptoms." (R. 611 (alterations added)). Based on Plaintiff's treatment history along with multiple examinations, Dr. Bellow opined that Plaintiff was "totally disabled" since his concussion, his symptoms stemmed from his chronic post-concussion syndrome and TBI, and his condition was "permanent" given his "limited response" to extensive treatment. (*Id.*).

On May 9, 2023, State agency psychological consultant Edward Jonas noted Plaintiff had severe anxiety, OCD, depression, and bipolar disorders, although Jonas determined he lacked sufficient evidence to determine whether Plaintiff's impairments resulted in limitations in any of the four major mental function areas, stating that "[t]here is no indication that there is a medical opinion from any medical source." (R. 367-71). Based on this purported lack of evidence, Jonas determined that Plaintiff was not disabled. (*Id.*). Upon reconsideration on August 9, 2023, State agency psychological consultant John Robert Vigna noted Plaintiff's medically determinable impairments (adding that Plaintiff also suffered from a neurodevelopmental disorder) and ultimately agreed with the notion that the record evidence was insufficient to determine disability. (R. 372-76). Instead, he maintained that to evaluate Plaintiff's functionality "a full mental status examination, completed prior to and recent to [December 31, 2013, the date last

insured] is necessary but is unavailable." (R. 375).

### B. Nonmedical Evidence

The record also contains nonmedical evidence. Plaintiff testified at the March 11, 2024, administrative hearing as to his work history, the severity of his medical issues, and how those medical issues affected his functional capacity. (R. 42-59). He stated that he lived by himself from June 2009 to December 2013. During that time, his OCD symptoms became progressively worse. (R. 53). In describing the nature of his symptoms, he reported that he read frequently, he was obsessed with the news, he struggled to participate in social activities in public, and he had difficulty being around strangers. (R. 52-53). At that time, he was also dealing with frequent suicidal ideation and indicated that his anxiety was both physically and mentally paralyzing. (R. 54-55).

According to Plaintiff, he last worked full-time as an attorney in 2009, when his OCD symptoms worsened and he could no longer maintain employment. (R. 44, 46-47). He attempted to work for a law firm again in 2010 but quit the same day he started because of his OCD. (*Id.* at 44). Though he looked for work over the next few years, he was unsuccessful, in part due to his admission into inpatient programs in 2011 and 2013. (R. 46-48). He acknowledged that he was "doing a bit better" after these treatment programs but unfortunately suffered a "moderate" TBI that significantly reduced his functional capacity. (R. 47). He has not been able to "perform like a normal adult since then" due to constant headaches and nausea worsened by flashing lights and looking at screens for too long. (R. 49-50, 52). Starting in late 2013, he participated in a special treatment program consisting of multiple types of therapies for his post-concussion symptoms for nine months at Bryn Mawr Rehab Hospital. (R. 47-48). He also underwent craniosacral treatments, which helped "for a little bit" but ultimately did not keep

his symptoms at bay. (*See* R. 50 (Plaintiff testifying that his symptoms would "slowly creep back")).

## III. ALJ DECISION

Following the administrative hearing, the ALJ issued a decision in which she made the following findings:

1. The claimant last met the insured status requirements of the Social Security Act on December 31, 2013.
2. The claimant did not engage in substantial gainful activity during the period from his alleged onset date of June 9, 2009 through his date last insured of December 31, 2013 (20 CFR 404.1571 *et seq.*).
3. Through the date last insured, the claimant had the following severe impairments: generalized anxiety, major depression, obsessive compulsive disorder, obsessive compulsive personality disorder, concussion in July 2023, and post-concussion syndrome (20 CFR 404.1520(c)).
4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).
5. After consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: he could tolerate frequent interaction with the public, coworkers, and

supervisors; could not perform work requiring a specific production rate, such as assembly line work or work that requires hourly quotas; and could deal with occasional changes in a routine work setting.

6. Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was born on June 8, 1980 and was 33 years old, which is defined as a younger individual age 18-49, on the date last insured (20 CFR 404.1563).

8. The claimant has at least a high school education (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569a).

11. The claimant was not under a disability, as defined in the Social Security Act, at any time from June 9, 2009, the alleged onset date, through December 31, 2013, the date last insured (20 CFR 404.1520(g)).

(R. 20-28). Accordingly, the ALJ found Plaintiff was not disabled. (R. 29).

## IV. LEGAL STANDARD

To be eligible for benefits under the Social Security Act, a claimant must demonstrate to

the Commissioner that he cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least 12 months. 42 U.S.C. § 1382c(a)(3)(A). A five-step sequential analysis is used to evaluate a disability claim:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. If he is not, then the Commissioner considers in the second step whether the claimant has a "severe impairment" that significantly limits his physical or mental ability to perform basic work activities. If the claimant suffers a severe impairment, the third inquiry is whether, based on the medical evidence, the impairment meets the criteria of the impairment listed in the "listing of impairments," . . . which result in a presumption of disability, or whether the claimant retains the capacity to work. If the impairment does not meet the criteria for a listed impairment, then the Commissioner assesses in the fourth step whether, despite the severe impairment, the claimant has the residual functional capacity to perform his past work. If the claimant cannot perform his past work, then the final step is to determine whether there is other work in the national economy that the claimant can perform.

*Sykes v. Apfel*, 228 F.3d 259, 262-63 (3d Cir. 2000); *see also* 20 C.F.R. § 416.920(a)(4). The disability claimant bears the burden of establishing steps one through four. If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner at step five to establish that, given the claimant's age, education, work experience, and mental and physical limitations, he is able to perform substantial gainful activities in jobs existing in the national economy. *Poulos v. Comm'r. of Soc. Sec.*, 474 F.3d 88, 92 (3d Cir. 2007).

Judicial review of a final decision of the Commissioner is limited. A district court is bound by the factual findings of the Commissioner if they are supported by substantial evidence and decided according to correct legal standards. *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence is "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate." *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 118

(3d Cir. 2000) (citations omitted). Even if the record could support a contrary conclusion, the decision of the ALJ will not be overruled as long as there is substantial evidence to support it. *Simmonds v. Heckler*, 807 F.2d 54, 58 (3d Cir. 1986). The court has plenary review of legal issues. *Schaudeck v. Comm'r of Soc. Sec.*, 181 F.3d 429, 431 (3d Cir. 1999).

## V. DISCUSSION

In his request for review, Plaintiff raises three claims (reordered): (1) in assessing Plaintiff's RFC, the ALJ ignored pertinent evidence regarding his diagnosis of ADHD and provided little rationale regarding his mental function limitations; (2) the ALJ failed to properly evaluate the medical opinion evidence; and (3) the record evidence provides a sufficient basis for this Court to find him disabled. (Pl.'s Br., ECF No. 7, at 11-29).

### A. The ALJ's RFC Assessment

#### 1. The Parties' Arguments

Plaintiff's claim challenging the ALJ's RFC assessment has three components. (*Id.* at 22-29). First, he argues that the ALJ erred in failing to find his ADHD severe at step two and takes issue with her comments that it was noted "by history" and "within normal limits" at an exam. (*Id.* at 26 (citing R. 595)). According to Plaintiff, multiple providers diagnosed him with ADHD, substantial evidence therefore existed supporting this diagnosis, and the ALJ should have at least considered how this impairment affected his functional capacity. (*Id.* (citing SSR 96-8P, 1996 WL 374184 (July 2, 1996))). Second, Plaintiff contends that at step two the ALJ also improperly reviewed his capabilities in the four main mental function areas. (*Id.* (citing 20 C.F.R. § 404.1520a)). Specifically, he maintains that the ALJ conducted hardly any evaluation of the evidence at this step, as she provided only a few conclusory sentences analyzing each

functional area. (*Id.* at 27 (citing R. 22)). Moreover, he alleges that the ALJ's few citations to the record actually supported his allegations of disability. (*Id.*). And third, Plaintiff asserts that she failed to "properly consider" the impact of his in-patient treatment on his ability to work on a regular and continuing basis. (*See id.* at 28-29 ("It is clear that the inpatient treatment would result in absenteeism that would exceed allowable tolerances per the VE testimony.")) Plaintiff concludes that these errors in turn led to an overstated RFC. (*Id.*).

The Commissioner responds that the ALJ's overall RFC analysis was error-free and that she actually gave Plaintiff the "benefit of any doubt" in reducing his RFC to unskilled work limited to no specific production rate quotas, only occasional changes in the work setting, and no more than frequent interaction with the public. (Resp., ECF No. 8, at 7 (citing R. 22)). First, the Commissioner asserts that Plaintiff's contention that multiple providers diagnosed him with ADHD was "disingenuous" because, as the ALJ correctly observed, the diagnosis was merely "by history," diagnosis alone is insufficient to establish a "medically determinable" impairment, and upon examination Plaintiff's "attention, concentration, and focus were all within normal limits." (*Id.* at 9 (citations omitted)). According to the Commissioner, because Plaintiff's purported ADHD was not a medically determinable impairment, the ALJ did not err by omitting any corresponding limitations in the RFC. (*Id.*). Second, the Commissioner argues that Plaintiff provided little evidence for the ALJ to consider in evaluating his limitations in the four mental function areas, and that reading the ALJ's decision as a whole, the ALJ actually credited, in part, Plaintiff's complaints of limited function. (*Id.* at 9-10). Third, the Commissioner refutes the notion Plaintiff would have had excessive work absences due to his participation in inpatient programs because they were "elective," "temporary," and "brief." (*Id.* at 10 (citation omitted)). Additionally, the Commissioner notes that upon discharge from these programs Plaintiff had

"moderate" GAF scores. (*Id.* at 10 n.11 (citing *Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-R)*, at 34 (4th ed. 2000))).

**2. Analysis**

The ALJ's analysis at step two was problematic for several reasons. First, in finding that Plaintiff's ADHD was not a medically determinable impairment, she stated that the diagnosis was "noted 'by history' and [that his] attention, concentration, and focus were all within normal limits at that exam." (R. 21 (citing R. 595) (alteration added)). This conclusory assertion was insufficient.

To the extent the ALJ discounted or ignored Plaintiff's ADHD because the diagnosis was "by history," the ALJ did not explain why such a methodology would warrant dismissal. Moreover, her citation to the record was misplaced given she cites to a "physician's statement for medical excuse" from Wenzel in which she commented on the severity of his mental impairments generally, reviewed the extent of his treating history with her, and ultimately concluded that he should be excused from jury service based upon his impairments. (R. 594-95). But nowhere in the letter does Wenzel comment upon Plaintiff's ADHD diagnosis specifically, nor does she opine that Plaintiff's "attention, concentration, and focus were all within normal limits," as claimed by the ALJ. (*See generally id.*; *see also* R. 21).

Furthermore, insofar as the ALJ meant to cite another part of the record, a review of the relevant documents tends to refute rather than support the ALJ's finding regarding the lack of severity of Plaintiff's symptoms. For instance: although an October 4, 2002, neuropsychological evaluation by Francis Colavita, Ph.D. and psychologist John R. Erbel contained Plaintiff's self-report that he was doing better in school since being diagnosed with ADHD and starting a course of medication, it further indicated that "in spite of his medication, there [were] still attentional

and concentrational factors" negatively impacting his academic performance (R. 555, 558); on September 8, 2015, Dr. Greenspan noted a prior diagnosis of ADHD and certain ongoing attention and concentration issues (R. 583); and although Wenzel noted in her February 13, 2023, medical source statement that Plaintiff's mental impairments had lasted for at least twelve months "based on history," in that same record (and others) she added that he continued to have difficulty thinking, concentrating, and maintaining attention (*see, e.g.*, R. 579, 585, 589, 592, 607, 609). Therefore, neither the specific record cited by the ALJ nor any of the other potentially relevant documents support her conclusion that Plaintiff's ADHD and associated symptoms were "within normal limits" and thus did not amount to a severe medically determinable impairment.

Though it is true that mere diagnosis alone is not sufficient to prove disability, *see* 20 C.F.R. §§ 404.1521, 404.1529(b); SSR 16-3p, 2017 WL 5180304 *3-4 (Oct. 25, 2017), here, Plaintiff does not merely point to his diagnosis. Instead, the above evidence demonstrates that multiple providers noted Plaintiff's ADHD and further opined as to how it negatively affected his functionality (and particularly his ability to maintain attention and concentration). (*See* R. 555, 558, 579, 583, 585, 589, 592, 607, 609). The ALJ was at the very least required to explain what evidence she relied upon in finding that Plaintiff's ADHD was not a severe (or even non-severe) medically determinable impairment necessitating consideration at later stages in her evaluation. *See* 20 C.F.R. § 404.1545(a)(2); *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011) (an ALJ is free to reject medical evidence but in so doing must indicate why evidence was rejected so that a reviewing court can determine whether "significant probative evidence was not credited or simply ignored"); *cf. Robert E. v. Comm'r of Soc. Sec.*, 2021 WL 5277193, at *6 (D.N.J. Nov. 12, 2021) ("[T]he ALJ must consider that severe impairment in combination with all the additional medically determinable impairments in combination while

formulating the RFC."); *Susan W. v. Kijakazi*, No. 22-cv-05765, 2023 WL 6366043, at *6 (D.N.J. Sept. 29, 2023) (remanding case where the ALJ never mentioned medically determinable impairments, at step two or during the formulation of the RFC).

Further, though failing to find an impairment severe at step two is normally harmless error where the ALJ identifies other severe impairments and continues through the remainder of the five-step review, *see, e.g.*, *Salles v. Comm'r of Soc. Sec.*, 229 F. App'x 140, 145 n.2 (3d Cir. 2007) ("Because the ALJ found in Salles's favor at Step Two, even if he had erroneously concluded that some of her impairments were non-severe, any error was harmless.") (citation omitted); *Shedden v. Astrue*, No. 4:10-CV-2515, 2012 WL 760632, at *9 (M.D. Pa. Mar. 7, 2012) (stating that "[a] failure to find a medical condition severe at step two will not render a decision defective if some other medical condition was found severe at step two"), it is reversible error for the ALJ to disregard the existence of a medically determinable impairment both at step two and in the formulation of the RFC. *Friday v. Comm'r of Soc. Sec.*, No. 1:20-cv-04504-NLH, 2021 WL 3879081, at *4, 7 (D.N.J. Aug. 31, 2021) (a step-two error is only harmless where the ALJ nonetheless accounts for "the missing medically determinable impairment in the RFC assessment and it would not otherwise affect the outcome of the case.").

Here, after entirely discounting Plaintiff's ADHD diagnosis at step two, the ALJ did not consider the impact of his associated symptoms in evaluating Plaintiff's paragraph "B" mental limitations or in crafting Plaintiff's RFC. (*See* R. 21-27). For example, in finding that he had only a "moderate" limitation in concentrating, persisting, or maintaining pace, the ALJ declared: "[c]onsidered were obsessive compulsive symptoms that could reasonably interfere with concentration, persistence, or pace." (R. 22). This analysis is conclusory and devoid of any reference to Plaintiff's ADHD and associated attention and concentration issues. The ALJ's

basis for finding Plaintiff had only a "moderate" limitation in adapting or managing himself was similarly constrained: "[c]onsidered were symptoms such as suicidal ideation that could reasonably interfere with adapting or managing oneself." (*Id.*). However, this analysis is again conclusory and ignores whether and how Plaintiff's ADHD may have affected his ability in this area. Next, in crafting Plaintiff's RFC, the ALJ only briefly mentioned Plaintiff's ADHD diagnosis once when surveying Wenzel's medical source statements, (R. 24), and offered no analysis at all about how the associated symptoms may have affected Plaintiff's functionality. (*See generally* R. 22-27).

Therefore, because the ALJ improperly discounted Plaintiff's ADHD without providing sufficient rationale for doing so, and because this error tainted the ALJ's later analysis, the Court will remand the matter.

**B. The ALJ's Treatment of the Medical Evidence**

In addition, Plaintiff argues that the ALJ erred in her evaluation of other relevant medical evidence (including opinion evidence), resulting in an overstated RFC assessment. (*See* Pl.'s Br., ECF No. 7, at 13-22). Because I remand this matter for further consideration of Plaintiff's ADHD, which may in turn affect the ALJ's subsequent evaluation of the medical evidence and determination regarding Plaintiff's RFC, I will not rule on Plaintiff's argument on this issue. *See Steininger v. Barnhart*, No. 04-5383, 2005 WL 2077375, at *4 (E.D. Pa. Aug, 24, 2005) (not addressing additional arguments because the ALJ may reverse his findings after remand). It is possible that, on remand, the ALJ may reach different conclusions as to the RFC.[2]

[2] Though I decline to affirmatively rule on Plaintiff's second claim related to the ALJ's treatment of the medical evidence given that the ALJ's step two analysis of Plaintiff's ADHD may alter that subsequent analysis, I note two sub-arguments from the parties which warrant some discussion. First, Plaintiff contends that the ALJ abdicated her duty to evaluate the persuasiveness of Dr. Goldman's "summary statement" on the ground that it did not contain a

**C. Remedy**

As for Plaintiff's request that the Court reverse the decision of the Commissioner and order that he be found disabled, I decline to grant such relief. Plaintiff contends that he is entitled to a finding of disability and an award of benefits based on the record evidence. (Pl.'s Br., ECF No. 7, at 29). According to Plaintiff, "it would be unreasonable to give the ALJ another opportunity to consider new evidence because the administrative proceedings would result only in a further delay in receipt of benefits." (*Id.* (citing *Tustin v. Heckler*, 591 F. Supp. 1049, 1049-1059 (D.N.J. 1984), *vacated in part and remanded*, 749 F.2d 1955 (3d Cir. 1984))). I disagree and find that remand—rather than an award of benefits—is the appropriate remedy. *See Gilliland v. Heckler*, 786 F.2d 178, 184-85 (3d Cir. 1986). An award of benefits is only

---

"function-by-function analysis" and was therefore not medical opinion evidence. (Pl.'s Br., ECF No. 7, at 21 (citing R. 582); *see also* R. 27). According to Plaintiff, Dr. Goldman's statement: indicated he was severely disabled since suffering a TBI in July 2013; was consistent with other opinion evidence; and should have at least been considered by the ALJ notwithstanding that it was not formatted as a typical medical opinion. (*Id.*). Though Dr. Goldman's statement takes a different form than many other medical opinions (i.e., it is narrative summary describing Plaintiff's treating history with Dr. Goldman, his diagnoses, and his prognosis without providing specific checkboxes indicating his metal functionality), it nevertheless contains some analysis of Plaintiff's functionality, and the ALJ therefore should consider it on remand in conjunction with the rest of the medical evidence.

Second, the Commissioner argues that much of the medical evidence contained in the record is not relevant because "retrospective medical opinions are generally insufficient to establish disability." (Resp., ECF No. 8, at 10-11 (citing *Small v. Commissioner of Soc. Sec.*, No. 02-3275, 2003 WL 1477783, at *3 (3d Cir. March 24, 2003); *Jones v. Chater*, 65 F.3d 102, 104 (8th Cir. 1995); *Magallanes v. Bowen*, 881 F.2d 747, 754 (9th Cir. 1989); *Adams v. Chater*, 1995 WL 462225, *7 (D. Kan. July 5, 1995))). But the Commissioner misconstrues this evidence. Though retrospective medical opinions alone may not establish disability, when the record contains some corroboration of a claimant's condition during the insured period, retrospective medical diagnosis may suffice in determining disability. *Small*, 2003 WL 1477783, at *3 (citing *Jones*, 65 F.3d at 104). Here, much of the medical evidence that post-dated Plaintiff's date last insured was both retrospective to the relevant disability period and was corroborated by evidence from that time (including Wenzel's April 28, 2010, summary of treatment, the discharge notes from Rogers Memorial Hospital, and other ancillary evidence).

appropriate, "when no evidentiary questions remain and the outcome of the case is dictated as a legal matter." *See Freeman v. Berryhill*, No. 16-2610, 2017 WL 1351425, at *7 (E.D. Pa., 2017) *report and recommendation adopted*, 2017 WL 1375185 (E.D. Pa. April 10, 2017). That is not the case in the instant matter. On remand, the ALJ will further consider and weigh the medical evidence as outlined in this Memorandum Opinion, which may affect the ultimate outcome of the case. Consequently, an award of benefits would be premature in this instance.

## VI. CONCLUSION

For the reasons set forth above, Plaintiff's request for review is **GRANTED** to the extent that it requests remand. This matter is remanded for further proceedings consistent with this memorandum.

BY THE COURT:

/s/ Lynne A. Sitarski
LYNNE A. SITARSKI
United States Magistrate Judge